UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ERIC NATHAN DERYKE,

    Defendant.
_____/

Case No. 1:23-cr-92

Hon. Hala Y. Jarbou

## **OPINION**

Defendant Deryke filed a motion to dismiss the indictment (ECF No. 26). Deryke argues that 18 U.S.C. § 922(g)(1), which imposes a ban on those convicted of felonies from possessing firearms, is unconstitutional in light of the Supreme Court's holdings in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) and *District of Columbia v. Heller*, 554 U.S. 570 (2008). Accordingly, he asks for dismissal of his indictment under § 922(g)(1). For the following reasons, the Court will deny Deryke's motion.

### I. BACKGROUND

The government charged Deryke with one count of the knowing, unlawful possession of a firearm after previously being convicted of a crime punishable by more than one year in prison. (Indictment, ECF No. 1.) The Pretrial Services Report (ECF No. 10) provides the following predicate offenses that qualify him for indictment under § 922(g)(1): a February 2008 conviction for carrying a dangerous weapon with unlawful intent, a July 2010 conviction for attempted felonious assault, a September 2015 conviction for carrying a concealed weapon, and a June 2017 conviction for police officer assault/resist/obstruct arrest and possession of a switchblade. (PSR, PageID.20-22.)

The Government provides a summary of their version of the facts that led to Deryke's arrest and indictment in their response to the motion to dismiss (ECF No. 27). The Government alleges that the felon-in-possession charges stem from an April 16, 2022, shooting involving Deryke. (Gov't Resp. 2, ECF No. 27.) On that evening, Deryke visited a bar where he became involved in a verbal altercation with another person. (*Id.*) Rather than go home for the night, Deryke allegedly waited for the other individual in the bar's parking lot. (*Id.*) When he saw that person exit the bar, Deryke brandished his weapon and the two exchanged gunfire. (*Id.*) In all, Deryke and three others sustained bullet wounds. He was hit in the leg, his opponent was hit multiple times, and two "innocent bystanders" were also hurt. (*Id.* at 2-3.) Rather than wait for an ambulance, a friend drove Deryke to the hospital. On the way, Deryke threw his gun out of the car window where it was found the next morning. (*Id.* at 3.) DNA collected from the gun matched Deryke, and witnesses at the scene identified him as one of the shooters. (*Id.*)

On July 18, 2023, Deryke was indicted by a federal grand jury on one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 1.)

## II. DISMISSAL STANDARD

A motion to dismiss an indictment in a criminal case is governed by Rule 12 of the Federal Rules of Criminal Procedure. Rule 12 permits pretrial consideration of any defense "the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). For example, a motion to dismiss an indictment for failure to state an offense can be raised by a pretrial motion if it does not require judicial determination of evidence that properly should be left to a jury. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment that is valid on its face cannot be dismissed based on the adequacy or sufficiency of its evidence. *See United States v. Williams*, 504 U.S. 36, 54 (1992). If a defendant's motion to dismiss requires consideration of facts that make up elements of the case, the motion to dismiss should be denied. *See United States v. Knox*, U.S. 77, 83 n.7 (1969) ("Rule

2

12(b)(1) of the Federal Rules of Criminal Procedure, which cautions the trial judge that he may consider on a motion to dismiss the indictment only 'those objections that are capable of determination without the trial of the general issue,' indicates that evidentiary questions . . . should not be determined on such a motion."). The Sixth Circuit has specifically held that "courts evaluating motions to dismiss do not evaluate the evidence upon which the indictment is based." *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001). "Indeed, the interpretation of an indictment . . . is generally limited to its four corners." *United States v. Ferguson*, 681 F.3d 826, 831 (6th Cir. 2012).

### III. ANALYSIS

The text of the Second Amendment reads, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Am. II. The precise meaning and parameters of the Second Amendment have long been debated. In recognition of this, the Supreme Court has, in recent years, explained more specifically what the Second Amendment means and who it protects. In *Heller*, the Court considered whether the Second Amendment guaranteed the right to keep and bear arms for self-defense or strictly addressed the collective right of maintaining a "militia." *Heller*, 554 U.S. at 577. In deciding the case, the Court found that it applied to an individual right to possess and carry firearms in case of confrontation. *See also McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) ("*Heller* makes it clear [the right to use handguns in self-defense] is 'deeply rooted in our Nation's history and tradition.'"). Although the right is far reaching, "the right [is] not unlimited, just as the First Amendment's right of free speech [is] not[.]" *Heller*, 554 U.S. at 595. For example, as the Court explained, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id*. at 626. In other words, "the Second Amendment protect[s] the fundamental right of 'law abiding, responsible citizens to own

3

firearms.'" *Tyler v. Hillsdale Cnty. Sherriff's Dep't*, 837 F.3d 678, 681 (6th Cir. 2016) (citing *Heller*, 554 U.S. at 626-27). In the Court's eyes, laws that prohibit felons from possessing firearms are not just theoretically permitted but are "presumptively lawful." *Heller*, 544 U.S. at 627 n.26.

In accordance with *McDonald* and *Heller*, courts developed a two-step framework for evaluating Second Amendment challenges. *Tyler*, 837 F.3d at 685 (collecting cases). The first step asked "whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (citing *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)). If the court determined that the challenged law did not infringe upon activity falling under "terms of the right as publicly understood when the Bill of Rights was ratified," then the law would survive the constitutional challenge. *Id.* (citing *Ezell v. City of Chicago*, 651 F.3d 684, 701-03 (7th Cir. 2011)). In such cases, courts concluded that "the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Ezell*, 651 F.3d at 702-03. It was the Government's burden to show that the law did not affect historically protected conduct. *Id.* at 703. At the second step, if the "historical evidence is inconclusive or suggests that the regulated activities—or in our case individuals—are not categorically unprotected," then the court would determine the "appropriate level of scrutiny and examine the 'strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.'" *Tyler*, 837 F.3d at 868 (quoting *Ezell*, 651 F.3d at 703).

In *Bruen*, the Supreme Court directly addressed this body of law for the first time. It held that "the constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156. As a result, the Court declared the "popular" "two-step approach, one step too

4

many," rejecting the idea that laws restricting Second Amendment rights should be subject to "means-end scrutiny." *Id*. at 2128. Instead, it endorsed a simpler test for evaluating challenges to firearms regulations that is more consistent with *Heller* and *McDonald*.

Although one step, the new standard can still be divided into two parts. First, a court must ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. If it does, "the Constitution presumptively protects that conduct." *Id*. If it does not, the inquiry ends there, and the law is constitutional. Assuming the conduct is covered by the plain text, a court must inquire into whether "a firearm regulation is consistent with this Nation's historical tradition." *Id*. Only if the answer is yes "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

### A. *Bruen* Standard

Deryke argues that applying the new *Bruen* framework to § 922(g)(1) renders the statute unconstitutional. First, he states that despite his felony status, he is still part of "the people" guaranteed the right of gun ownership by the Second Amendment. As a result, his conduct – possessing a weapon as a felon – is protected by the plain text of the Amendment, and § 922(g)(1) is presumptively unconstitutional. Since, as he argues, the Government cannot meet its burden of showing a historical tradition of denying weapons to felons, the law is ultimately unconstitutional.

#### 1. *Bruen* only applies to law-abiding citizens

*Bruen* does not support the principle that Deryke is protected by the Second Amendment. Deryke begins his effort to trace the meaning and scope of the term "the people" by referencing *Heller*. In *Heller*, the Court briefly touched on the meaning of the phrase when it endorsed a definition that was consistent across the Constitution. *See Heller*, 554 U.S. at 581 ("[I]n all six other provisions of the Constitution that mention 'the people . . . the term refers to all members of

5

the political community, not an unspecified subset."). Later, the Court concluded that the framers' use of the term "the people" created "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id*. Although this language seems to broadly support Deryke's position, his reliance on it is misplaced because the Court's primary concern in determining the scope of "the people" was whether the right was individual or collective, not who it belonged to. Indeed, its ultimate holding, that "the Second Amendment protects an individual right to possess a firearm unconnected with service in a militia," does not address which individuals have that right. *Id*. at 572. Given that narrow holding, the Court did not try to "take an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id*. at 626. Despite this disclaimer, the Court did feel compelled to specifically address whether Second Amendment protections extend to felons. It answered in the negative, emphasizing that, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id*. Later, in *McDonald*, the Court considered whether the *Heller* framework applied to the states through the Fourteenth Amendment. In holding that it did, the Court again addressed the question of whether newly expanded gun rights should be interpreted to allow felons to possess guns. Again, the Court, echoing *Heller*, said that they should not.

> We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons . . . . We repeat those assurances here.

*McDonald*, 561 U.S. at 786.

In the wake of *Heller* and *McDonald*, Sixth Circuit courts have unanimously upheld the validity of felon-in-possession statutes, often relying exclusively on the dicta from the two cases cited above. *See, e.g.*, *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) ("*Heller* states that the Second Amendment right is not unlimited, and, in fact, it is specifically limited in the case of felon prohibitions."); *United States v. Frazier*, 314 F.App'x 801, 807 (6th Cir. 2008) ("The

6

Supreme Court clarified that the right secured by the Second Amendment is not unlimited.") (internal quotations removed); *United States v. Whisnant*, 391 F.App'x 426, 430 (6th Cir. 2010) ("[The defendant] misreads the decision . . . in *Heller*, the Supreme Court recognized an individual right to bear arms but also held that 'the right secured by the second Amendment is not unlimited.'"); *see also United States v. Khami*, 362 F. App'x 501, 508 (6th Cir. 2010) (holding there was no persuasive reason to disregard the Supreme Court's dicta on the constitutionality of felon in possession statutes); *United States v. Goolsby*, No. 21-3087, 2022 WL 670137, at *2 (6th Cir. Mar. 7, 2022) ("Of course, [the defendant] is right to start with *Heller*. But he is wrong to think that *Heller* helps him. Although *Heller* recognized the fundamental right of law-abiding citizens to keep and bear arms, it also declined to "cast doubt on longstanding prohibitions on the possession of firearms by felons.").

*Bruen* did nothing to disturb the holdings in any of these cases, and there is nothing to suggest that they would be decided differently in its wake. *Bruen* made abundantly clear that *Heller* remains the touchstone for Second Amendment analysis. *See Bruen*, 142 S. Ct. at 2118 ("The test that the Court set forth in *Heller* and applies today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.") The clarification it added, abrogating the use of means-ends scrutiny to evaluate Second Amendment restrictions, has no bearing on Deryke. *Bruen* applies only to regulations that "prevent *law-abiding* citizens . . . from exercising their right to keep and bear arms." *Bruen*, 142 S. Ct. at 2156 (emphasis added). The use of "law-abiding" as a qualifier is no accident. It is used fourteen times throughout the opinion. *Id.* at 2122, 2125, 2131, 2133, 2134, 2135 n.8, 2138, 2138 n.9, 2150, 2156. *Bruen* did not directly address § 922 (g)(1) or similar statutes, because it did not

7

need to.  The Court had already recognized in *Heller* – and again in *McDonald* – that felon-in-possession statutes were "presumptively lawful."  *Heller*, 544 U.S. at 627 n.26.

As a result, there is no new standard that Deryke can rely on to invalidate § 922(g)(1).  The *Bruen* framework does not apply to Deryke because he is not a law-abiding citizen.  The Supreme Court and courts in this circuit, relying on the language cited above from *Heller* and *McDonald*, have been clear that felon-in-possession prohibitions are consistent with the Second Amendment.  In the absence of any compelling reason to disregard such persuasive language, the inquiry into the constitutionality of § 922(g)(1) ends here.  Deryke's motion to dismiss the indictment will be denied.

### 2. Even if felons were covered by the Second Amendment, there is a historical tradition of keeping guns out of the hands of untrustworthy people

Although the Court finds that Deryke's challenge fails before reaching the *Bruen* standard, even if Defendant's conduct were presumptively protected by the plain text of the Second Amendment, his challenge would still be unsuccessful based on the historical tradition of firearm regulation in this country.  In *Bruen*, the Court endorsed a burden-shifting framework under which, if the defendant can show a challenged regulation infringes upon presumptively protected conduct, the Government bears the burden of showing that regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126.  The Court finds that the Government has met this burden.

Under *Heller* and *Bruen*, the Government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. This is relevant because the Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Heller*, 544 U.S. at 599.  In order to show that a right has roots in the historical tradition of firearm

regulation, the Government must identify an analogous regulation from the time the Constitution was adopted. *Bruen*, 142 S. Ct. at 2133. The identified regulation need not be a "historical twin," but it must be a "well-established and representative analogue." *Id*. Just as history teaches us which modern arms are protected by the Second Amendment, so too must history "guide our consideration of modern regulations that were unimaginable at the founding." *Id*. Therefore, the key question is not whether the historical analogue is identical to the challenge law, but whether the two are "relevantly similar." *Id*.

Two features identified in *Heller* and *McDonald* that render regulations relevantly similar are "how and why the regulations burden law-abiding[1] citizen's right to armed self-defense." *Id*. "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations." *Id*. (citing *McDonald*, 561 U.S. at 767) (internal quotations omitted). Such analogical reasoning is "neither a straitjacket nor a regulatory blank check." *Id*. Though a historical analogue and the modern-day regulation must bear a close relationship, the modern regulation need not be "a dead ringer for historical precursors." *Id*.

In support of its contention that historical analogues exist for § 922(g)(1), the Government offers four categories of evidence.

### (a) English laws

*Bruen* suggested that English law is among the precursors to the Second Amendment that may be considered for the purpose of finding a historical analogue because the Second Amendment "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127-28. The

---

[1] Even under the historical tradition framework, the Court was careful to emphasize that the analysis only applies to law-abiding citizens. However, having addressed this aspect of *Heller*, *McDonald*, and *Bruen* in the previous section as a dispositive issue, the Court will disregard it here.

Government cites an Eighth Circuit case, *United States v. Jackson*, which examined English laws that prohibited certain groups from obtaining firearms on the grounds that religious minorities like Catholics "were dangerous to the Peace of the Kingdom." *United States v. Jackson*, 69 F.4th at 495. The court in *Jackson* also stated that the "English Bill of Rights established Parliament's authority to determine which citizens could 'have arms by law.'" *Id*. (citing W. & M. Sess. 2, c. 2, § 7 (1689)).

### (b) Revolutionary War era laws

The Government also cites laws from the revolutionary war era. Again, relying primarily on the historical analysis from *Jackson*, the Government suggests that before independence, "the American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as outside the political community." (Gov't Resp. 15, ECF No. 27.) For example, some states disarmed Catholics, ostensibly because they were perceived as dangerous or insufficiently loyal to the governing authority. *See Jackson*, 69 F.4th at 502-03 (citing Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020)). Although such laws "would be impermissible today under other constitutional provisions," they are nevertheless "relevant . . . in determining the historical understanding of the right to bear arms." *Id*. at 503. The Government also points to laws in Connecticut, Massachusetts, Rhode Island, North Carolina, New Jersey, Pennsylvania, and Virginia that disarmed any state citizens that "refused to declare an oath of loyalty." (*See* Copies of State Statutes, ECF 27-2, ECF No. 27-2, PageID.402-411.) At the same time the States were stripping disloyal citizens of their arms, several of them were simultaneously enacting state constitutions which codified the right to bear arms. (*See* Copies of State Constitutions, ECF No. 27-2, PageID.412-414.) Thus, at the time, states did not see disarmament of those outside "the political community" as incongruous with the right of citizens to bear arms.

### (c) Ratification proposals

*Heller* addressed one particular "highly influential" ratification proposal that provided for a right to bear arms "unless for crimes committed, or real danger of public injury from individuals." *Jackson*, 69 F.4th at 503. The Government concedes that the proposal was not adopted, but it notes that "the founders may not have 'object[ed] to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms' because that limitation 'was understood as self-evident.'" (Gov't Resp. 16 (citing Stephen P. Halbrook, *The Founder's Second Amendment: Origins of the Right to Bear Arms* 273 (2008).)

### (d) Felony laws

The Government next addresses the country's tradition of punishing felony offenses. Historically, felonies were reserved for crimes that carried the possibility of capital punishment at the most severe end and forfeiture of lands and goods at the other. (*Id*. at 17.) The Government cites several offenses that were considered felonies in the colonial era, noting that they included both violent and nonviolent crimes.

First, "Pennsylvania, New York, and the First Congress imposed forfeiture, capital punishment, or both for murder, piracy, burglary, robbery, rape, arson, and malicious maiming or wounding." (*Id*. at 18; *see* Copies of Criminal Statutes, PageID.414-422.) However, felony punishments were also available for crimes that "were neither violent nor inherently dangerous," including forgery and counterfeiting. (*Id*.) Given that that Colonial-era criminal codes ascribed punishments up to death for such a wide variety of crimes, there is ample evidence to conclude that the right to bear arms can be abrogated by a modern felony conviction.

> None of the historical regulations above are identical to § 922(g)(1), but they are 'relevantly similar' in three respects. *Bruen*, 142 S. Ct. at 2132. First, the historical regulations and § 922(g)(1) impose "comparable buden[s]" on any "law-abiding citizen's right to armed self-defense." *Id*. at 2133. Second, those burdens are "comparably justified." *Id*. Whether violent or nonviolent, whether dangerous or

11

> not dangerous, whether historical or modern, a felony offense violates the social contract, demonstrates disloyalty to the law and to the civic community, and thus justifies the "legitimate consequence" of disarmament. *Tyler*, 837 F.3d at 708 (Sutton, J., concurring). And third, the historical regulations show that the founding generation "would . . . have accepted" § 922(g)(1)'s prohibition on the possession of firearms by felons, because that same generation imposed severe sanctions for felony offense. *Bruen*, 142 S. Ct. at 2133. Section 922(g)(1) therefore fits within the Nation's historical tradition of firearm regulations.

(*Id*. at 18-19.)

The Court agrees with the Government that there is sufficient basis to find a historical tradition in this country of disarming people like Deryke who have committed felonies. *Bruen* did not give district courts a great deal of direction on how to apply the "relevantly similar" test. However, the Court did give an example of which types of regulations may not pass the test:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem but did so through materially different means, that could also be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Bruen*, 142 S. Ct. at 2131. By reversing what the Court said is evidence that a regulation is not constitutional, it is possible to consider what may be evidence of constitutionality. First, if the problem is not a novel one, there should be evidence that people at the time attempted to address it. Second, historical attempts to address the problem should not have come through materially different means. Third, if similar proposals from the time period were rejected as unconstitutional, then the current regulation is almost certainly unconstitutional as well. The Court also noted, however, that "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id*. Therefore, "cases implicating unprecedented societal concerns or dramatic technological changes may require

12

a more nuanced approach." *Id*. Crucially, the Court also addressed why historical analysis is necessary. It explained that "'[u]pholding every modern law that remotely resembles a historical analogue' . . . 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id*. (citing *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

Here, the Government does not identify a "historical twin" to § 922 (g)(1). However, a historical law need only be "relevantly similar" to serve as an analogue. In looking at whether a law is relevantly similar, the Supreme Court has suggested that it is important to consider the intent behind the two laws and the way that the previous law and the modern regulation burden Defendant's rights. *See Bruen*, 142 S. Ct. at 2133. The intent behind § 922 (g)(1), according to the Government, is twofold. First, to punish the felon for violating "the social contract." (Gov't Resp. 18.) Second, to keep weapons out of the hands of people who have "demonstrate[d] disloyalty to the law and to the civic community." (*Id*.) Looking at the historical analogues proffered by the Government, two stand out as bearing particular relevance to modern felon-in-possession statutes.

First is the practice of disarming certain groups of people who were believed to harbor disloyalty to the government. This practice demonstrates a conception at the founding that guns could be dangerous in the hands of those whose propensity to follow the laws of the land was in question. In this aspect, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barratt, J., dissenting), *majority decision abrogated by Bruen*, 142 S. Ct. at 2111.

Deryke rightly points out that the "'ignominious practice' of excluding entire groups based on identity alone is no longer constitutionally acceptable[.]" (Def's Mot. 12 (citing *United States*

13

*v. Goins*, 647 F.Supp.3d 538, 552 (E.D. Ky. 2022); *Range v. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023)).). While that may be so, that determination is not something the Supreme Court asks courts to consider in *Bruen*. Citing historical tradition is not the same as endorsing the outdated analogue. Further, even now-unconstitutional laws can shed light on what legal values the Founders held and how they conceived of fundamental rights. The regulations cited here serve only as examples of how our forebearers viewed the right to bear arms and what characteristics, dispositions, or acts should strip someone of such a right. The fact that they were misguided or flatly wrong about who was disloyal or dangerous does not change the fact that they felt it necessary and acceptable to remove firearms from groups they perceived to possess those traits.

The second key analogue is the historical punishment for felony convictions. The Government's examples show that, at the founding and beyond, states had no issue with depriving people of life, liberty, and fundamental rights for violation of the social contract, even for what today would be considered nonviolent and less serious crimes. If the state could deprive a felon of life for forgery at the founding, then it stands to reason that they can deprive a felon of the right to bear arms today. Depriving a felon of their right to carry a gun does not, therefore, represent an "outlier our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2131.

### 3. Nearly every court to consider this issue since *Bruen*, besides one, has come to the same conclusion: § 922(g)(1) is constitutional

Since *Bruen* was decided last year, dozens of district courts and several appellate courts have considered challenges to § 922(g)(1) and come to the same conclusion as this Court: that the statute is constitutional. In the Western District alone, the issue has been considered at least five times in the previous ten months. *See, e.g.*, *United States v. Robinson*, No. 1:23-cr-37 (W.D. Mich. May 19, 2023); *United States v. Meeks*, No. 1:21-cr-90 (W.D. Mich. Mar. 21, 2023); *United States v. Black*, No. 1:22-cr-158 (W.D. Mich. Feb. 27, 2023); *United States v. Phillips*, No. 1:22-cr-118

14

(W.D. Mich. Feb. 2, 2023); *United States v. Branch*, No. 1:22-cr-137 (W.D. Mich. June 1, 2023). Though the Sixth Circuit has not addressed the issue, other courts in this circuit beyond this district certainly have, and so far the Court is aware, they unanimously reach the same conclusion that the Court does today. *See United States v. Nelson*, No. 22-20512, 2023 WL 4249367, at *5 (E.D. Mich. June 29, 2023) (collecting cases).

The only noteworthy exception comes from the Third Circuit where the en banc court declared that § 922(g)(1) was unconstitutional as applied to a defendant with a twenty-five-year-old felony-equivalent state conviction for defrauding the government. *See Range*, 69 F.4th at 98. The court in *Range* first found that felons were presumptively entitled to Second Amendment protections. Second, it concluded that the Government – bringing much the same evidence as the Government in this case – "ha[d] not shown that the Nation's historical tradition of firearms regulation supports depriving Range of his Second Amendment right to possess a firearm." *Id*. at 106 (citing *Bruen*, 142 S. Ct. at 2126). While the Court is mindful of the persuasive value of the opinions of a federal court of appeals outside this Circuit, *Range* is not binding. The Court declines to follow the Third Circuit's analysis for several reasons. First, the Court agrees with the dissent in *Range* that the panel's "analysis is inconsistent with the Supreme Court's jurisprudence" and that it "downplays the Supreme Court's consistent admonishments that felon bans are 'longstanding' and 'presumptively lawful.'" *Id*. at 113-14 (citing *Heller*, 554 U.S. at 626-27; *McDonald*, 561 U.S. at 786).

*Range* also endorsed a particularly narrow reading of the historical analysis test adopted in *Heller* and emphasized in *Bruen*. In response to the Government's argument that founding-era felony punishments were even more harsh than equivalent restrictions of Second Amendment rights today, the court said, "That the Founding-era governments punished some nonviolent crimes

15

with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Id.* at 105 (emphasis in original). However, the *Bruen* decision did not demand that a law have a particular and distinct historical analogue, only a relevantly similar one. In the Court's judgment, *Range* misinterprets *Bruen* by imposing an overly stringent standard on the Government, requiring it to produce evidence of an all-but-identical law that existed at the time of the founding despite the fact that the conception of which people pose a risk to society, and how to punish and protect, has changed.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the indictment will be denied. The Court will enter an order consistent with this Opinion.

Dated: October 27, 2023         /s/ Hala Y. Jarbou
                                HALA Y. JARBOU
                                CHIEF UNITED STATES DISTRICT JUDGE